OPINION
{¶ 1} Appellant Rhonda Sauers ("Rhonda") brings this appeal from the judgment of the Court of Common Pleas of Seneca County, Juvenile Division, modifying residential parent status from her to the father, Russell Sauers ("Russell").
 {¶ 2} Cheyenne Sauers ("Cheyenne") is the 14 year old son of Rhonda and Russell. During Cheyenne's life, he has primarily resided with Rhonda. Approximately three years ago, Cheyenne went to live with Russell in Florida due to his claims that Rhonda's live-in boyfriend, Chester Matthews ("Matthews") verbally abused him. Cheyenne lived with Russell less than a year before he made *Page 3 
allegations that Russell was physically abusing him and returned to Ohio to reside with Rhonda again.
 {¶ 3} On October 19, 2006, Rhonda requested unruly child charges be filed against Cheyenne due to his continued failure to follow house rules. The officers filed the complaint and took Cheyenne into custody. On October 20, 2006, the magistrate held the adjudication hearing and Cheyenne admitted the allegations. The magistrate then found Cheyenne to be unruly and proceeded with the dispositional hearing. Upon his return to the Youth Center, Cheyenne wrote a letter objecting to the magistrate's disposition stating that he would not perform the community service and that he did not want to go home because Matthews was abusive. Based upon the allegations of abuse, the trial court referred the matter to the Seneca County Department of Job and Family Services ("the Agency"). The trial court then placed Cheyenne in the temporary custody of his aunt pending the results of the investigation. On October 23, 2006, a dispositional hearing was held. Custody of Cheyenne was transferred to the Agency because the aunt no longer wished to have Cheyenne in her home. Cheyenne was placed in a foster home. While in the foster home, Cheyenne was suspended from school for punching another student in the face. Soon afterwards, Cheyenne ran away from the foster home, claiming that one of the other foster children was abusing him. *Page 4 
Cheyenne was then placed in the Youth Center pursuant to another case alleging delinquency.
 {¶ 4} On December 5, 2006, a further dispositional hearing was held. The Agency's social worker testified that the abuse allegations made by Cheyenne were unsubstantiated. The social worker further testified that both Cheyenne's younger brother and his older sister denied the allegations of abuse. The social worker's conclusion was that she had no concerns with Cheyenne returning to Rhonda's home.
 {¶ 5} A counselor from Fireland's Counseling and Recovery Services, who had been treating Cheyenne and his family due to Cheyenne's poor performance at school, poor grades, and negative school behaviors, testified that he had observed Cheyenne, Rhonda, and Matthews in their home for a few months. He testified that the interaction between Cheyenne and Matthews was very positive and he saw no indications of abuse. He further testified that Cheyenne had been diagnosed with Oppositional Defiant Disorder and possible Attention Deficit Hyperactive Disorder. However, no medication was prescribed for this condition. Tr. 33. The reason for the lack of medication was that the doctor was unsure of the medication's effectiveness in this case and the possible side effects which caused Rhonda to decline medication for Cheyenne at this time. Id. at 33 and 38. Finally, he stated that Rhonda and Matthews' parenting skills *Page 5 
had improved since counseling started and that he had no concerns about returning Cheyenne to the home.
 {¶ 6} Russell testified by telephone[1] that Cheyenne was welcome to live with him, but he did not ask to be named the residential parent. Russell testified that Cheyenne never indicated in any manner that he was afraid of Matthews. To the contrary, Cheyenne seemed to get along well with Matthews and enjoyed doing various activities with Matthews. Russell also testified that Cheyenne is a manipulative child who does not like to follow rules and rebels against them.
 {¶ 7} Cheyenne's older sister, Kyde, testified at the hearing that Matthews could be verbally abusive, which she defined as cussing and being loud. She did not recall any specific instances where the verbal abuse was directed at Cheyenne and described the behavior as "not bad stuff, it's just how he is." Tr. 123. She testified that Cheyenne had stated he had been struck by Matthews once or twice, but never with an object. However, she had not observed any of the physical abuse claimed by Cheyenne. She also testified that Cheyenne does not like rules or authority figures.
 {¶ 8} Finally, Cheyenne testified that Matthews had once struck him with a rake for getting suspended from school. Cheyenne also alleged that the next day, Matthews had struck him with his hand after Cheyenne put his hands around his *Page 6 
four year old brother's neck, picked him up, and threw him down to the ground while performing a WWF "Choke Slam." Cheyenne also claimed that he told his principal and a teacher about the incidents. However, these are both mandatory reporters by statute and the Agency indicated that no reports were made. Cheyenne then testified that any physical contact as punishment is what he considers to be abuse. He also stated that he did not think community service or chores around the house to be proper punishment either. Lastly, he testified that he did not like parents or any authority figures telling him what to do and that he wanted to live either in a foster home or with his 18 year old sister.
 {¶ 9} On January 3, 2007, the trial court entered judgment modifying the custody from Rhonda to Russell. Russell was ordered to retrieve Cheyenne within 10 days. Rhonda filed a motion to stay the judgment pending appeal, but the motion was denied. On January 30, 2007, Rhonda filed this appeal and raised the following assignments of error.
 The trial court committed reversible error when it relied upon R.C. 3109.04 in determining disposition for a child found to be unruly, instead of the correct R.C. 2151.353 and 2151.354.
 The trial court committed reversible error when it granted legal custody of the child to [Russell] when [Russell] failed to file a motion for custody prior to the dispositional hearing, as required by R.C. 2151.353(A)(3).
 The trial court abused its discretion in granting legal custody of the child to [Russell], as this determination was against the manifest weight of the evidence. *Page 7 
 {¶ 10} In the first assignment of error, Rhonda claims that the trial court applied the incorrect statute. The trial court indicated in its judgment entry that it was applying the factors under R.C. 3109.04(F) to make the custody determination. However, this case is not a custody determination, but a disposition after an unruly adjudication.
 A distinction must be made between a determination of custody in a juvenile court and a placement or disposition of a child after a finding that such child is neglected, dependent, delinquent or unruly. R.C. 3109.04 is applicable to the former and R.C. 2151.35.3, 2151.35.4, and 2151.35.5 are applicable to the latter.
In re Height (1975), 47 Ohio App.2d 203, 207, 353 N.E.2d 887. See alsoIn re Cramer (Apr. 20, 1982), Hardin App. No. 6-81-1, unreported. Since the matter was before the trial court on an unruly disposition, not a request for modification of custody, the appropriate statute to be considered is R.C. 2151.354, not R.C. 3109.04, and the first assignment of error is sustained.
 {¶ 11} Rhonda next claims that the trial court erred in modifying custody without prior notice. R.C. 2151.354 provides for the following dispositions in an unruly case.
(A) If the child is adjudicated an unruly child, the court may:
 (1) Make any of the dispositions authorized under [R.C. 2151.35.3];
 * * * *Page 8 
 (4) Commit the child to the temporary or permanent custody of the court.
R.C. 2151.35.4. Additional dispositions allowed by R.C. 2151.35.3 are as follows.
 (1) Place the child in protective supervision;
 * * *
 (3) Award legal custody of the child to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child;
R.C. 2151.35.3(A). The statute specifies that any person who wishes custody of the child file a motion requesting an award of legal custody. This clause has been interpreted to include parents. In re Farace (Dec. 31, 1997), Scioto County No. 96CA2469. No such motion was filed in this case, either before or during the hearing. In fact, the closest thing to a motion for an award of legal custody was father's statement that "if [Cheyenne] can't go back to mom and Chet, thenthere's a place in Florida for him. Tr. 151. Since no dispositional motion for an award of legal custody was made by father, the trial court erred in awarding legal custody of the child to the father. The second assignment of error is sustained.
 {¶ 12} Finally, Rhonda argues that the trial court's judgment awarding legal custody to Russell was against the manifest weight of the evidence. "When an appellant challenges a trial court's judgment in a civil action as being against the manifest weight of the evidence, the function of the appellate court is *Page 9 
narrowed to an examination of the record to conclude if there is any competent, credible evidence to support the underlying judgment."Pesek v. Berkopec-Pesek, 8th Dist. No. 87840, 2007-Ohio-2630, ¶ 38. A review of this record indicates that there is very little evidence to support the trial court's judgment and what evidence there is comes from a fourteen year old boy whose testimony was far from reliable and who is the subject of the unruly hearing. Cheyenne's credibility was summed up adequately by the attorney for the Agency during closing arguments.
 So there's been experts in the court to read that the IEP and the nice little letters by all the teachers that would point out that these behaviors by Cheyenne have been consistent through his time there; his ability not to cooperate, disrupts the class, and eventually asked to get out.
 If you'll read in one in from the band, how he joined band stopped cooperating, eventually wanted to go to choir. That's been his solution in everything. When he doesn't like things he wants to move onto something else.
 In fact, you heard father talk about how he went from mom to Florida. Dad put in his rules, his rules were as described to us. I think there was some corporal punishment defined there, but as anyone knows in Ohio it's allowed in this State if it is consistent with the discipline. There's nothing in there that sounds like abuse. He defined it as abuse and got himself sent back to Ohio.
 His own words were that, "mom was not strict. Mom didn't discipline him." When mom put the foot down and said you're gonna start doing your chores, he said that was an unusual reasonable (sic) punishment, doing chores. And that's why he was unruly and that's how this all started. Which is why we have the sister up there trying to explain how she didn't think *Page 10 that was unreasonable but she would change that to suit him. In fact, she said he had a different theory for discipline, which was none.
 And so (Inaudible) be careful here. * * * [Mr. Platt] described the parents' cooperation on the plan. He's the only expert in the area that's actually worked with this family. He describes how in this case it's a (sic) issue of manipulation and issues of control. And to actually give [Cheyenne] what he wants in this instance would be counter to his best interest and counter toward what they would be in MST.
 And you can see him and through his demeanor throughout this proceeding, in the way he has sat there and behaved, that's what he wants.
 * * *
 But as to further investigation [of the alleged abuse], sadly, Your Honor, you have the dictation in front of you. And in there it outlines Ms. Perkins contact with the family. In fact, she's talked to mom, dad — or, actually, to Mr. Chester (sic) and she also talked to Cheston, [the younger brother]. You heard the boys (sic) say that sometimes Cheston lies, but Cheston who's the letter — the subject of that letter, described that none of this happened.
 But Kyde, who he vouched for in there, now claims to have never spoken to Jenny Perkins, is referred to in there saying that this didn't happen and — and why? She didn't wanna (sic) tell him that in this courtroom.
Tr. 153-56. In short, the investigation of the abuse allegations turned up no evidence that any abuse had ever occurred. The only arguments made that Cheyenne should not be returned to his mother came from the guardian ad litem, who based his opinion on the fact that he believed Cheyenne was afraid of *Page 11 
Matthews and should remain in foster care, and Cheyenne's attorney, who also argued that Cheyenne should remain in foster care because the Agency had not conducted a "real" investigation into the abuse allegations.
 {¶ 13} Although there was a great deal of testimony that returning Cheyenne to Rhonda would be no cause for concern, there is no testimony concerning having Cheyenne go live with Russell. Russell stated in his narrative that if Cheyenne could not go back to Rhonda, he would allow Cheyenne to live with him. However, no questions were ever asked concerning whether placing Cheyenne with Russell would be in his best interests. The issue was not addressed in any way. Instead, the idea was treated as a possible back-up plan so that if the trial court did not wish to return Cheyenne to Rhonda, the State of Ohio would not have to keep him in foster care. During its closing argument, the Agency argued that the child should be returned to Rhonda and counseling continued "or I think we send the kid back to Florida at this point." Tr. 159. This is not competent or credible evidence to support the decision to send Cheyenne to live with Russell. Therefore, the trial court's decision is against the manifest weight of the evidence. The third assignment of error is sustained. *Page 12 
 {¶ 14} The judgment of the Court of Common Pleas of Seneca County, Juvenile Division is reversed and the matter remanded for further proceedings.
Judgment reversed and cause remanded.
 ROGERS, P.J., and PRESTON, J., concur.
[1] Due to Russell being domiciled in Florida, the trial court granted him permission to participate in the hearing, as both a party and a witness, via telephone. *Page 1